Billings, Thomas P., J.
This medical malpractice/wrongful death case was tried to a jury in my session from September 8 to 11, 2009. In answer to special questions, the jury found that the defendant was not negligent in his care and treatment of the plaintiffs decedent. Judgment therefore entered for the defendant. The plaintiff filed a timely motion for new trial on the ground that the verdict was against the weight of the evidence.
For the reasons that follow, the plaintiffs Motion for New Trial is ALLOWED.
FACTS
The primary facts in this case were undisputed. John L. Howard, an educated and highly accomplished 46-year-old man, sustained an injury to his left knee while playing basketball in the late afternoon of Sunday, March 28, 2004.
Mr. Howard had undergone a previous surgery on his other knee, on August 12, 1998. At that time Dr. Neil Herman performed a reconstruction of a torn ACL (anterior cruciate ligament) and repaired a torn lateral meniscus. Dr. Herman, like Dr. Brassard (the defendant in this case), practiced with Framingham Orthopedic Associates, Inc., though there is no indiction that Dr. Brassard had any involvement in or knowledge of Mr. Howard or his procedure at that time, or that he knew in 2004 that Mr. Howard had been a patient of the practice in 1998.
Of significance to this case is the fact that on October 2, 1998, or six and one-half weeks after his surgery, Mr. Howard was seen with non-tender but substantial swelling in his right calf. Dr. Herman referred him for a venous ultrasound, which picked up “a very large, deep clot up to the femoral region” (i.e., a deep vein thrombosis, or DVT). Mr. Howard was sent to the emergency room for immediate admission and anticoagulation with heparin. He was discharged after four-days on Coumadin, which he was still taking in mid-December but had discontinued by May of the following year.
For his March 28, 2004 injury, Mr. Howard was seen in the Emergency Room of MetroWest Medical Center’s Framingham Union campus, and diagnosed with a rupture of the patellar tendon. The ER record does not mention any history of deep vein thrombosis or other clotting disorder. Mr. Howard was released to home and told to report back to the Emergency department at 7:00 a.m. the next day, to see Dr. Brassard. A copy of the Emergency department record was sent to Dr. Alfano, Mr. Howard’s primary care physician, who had prescribed his Coumadin therapy in 1998-99.
Mr. Howard reported back to the hospital as directed on the morning of March 29. Dr. Brassard spoke with him soon after he arrived. The interview was structured around a form for day surgical patients, developed by the hospital and called “H&P Short Form.”[1] (Ex. 1, pp. 11-12.) Dr. Brassard completed the form as Mr. Howard answered his questions. The form does not reflect that Mr. Howard had had a DVT, or any other complication, following his 1998 surgery. The surgeiy itself is mentioned:
PSH [Prior Surgical History] R knee-patella tendon repair
and there is mention as well of a hernia repair.
Dr. Brassard testified that he customarily asks the patient if he has had any significant medical issues, and that Mr. Howard must have said no or they would be reflected on the form. He does not customarily ask, and he did not ask Mr. Howard, about the outcome of prior surgeries, or whether the patient had any complications or medical issues following them, “because in my experience they tell you.”
Sometime later, a nurse saw Mr. Howard, checked his vital signs, interviewed him, and completed “Pre Procedure Assessment” and “Pre Procedure Interview” forms (Ex. 1, pp. 17-18). A section on the latter form titled “Functional Health Pattern” has a checklist of twenty categories of disorders;[2] of these only “Bleeding/Clotting” is checked, and “Clotting” is circled. Just below this, in the space labeled “Past Med/Surg Hist,” the nurse noted:
DVT R[ight] leg p[ost] ACL, MCL & full reconstruction^ yrs. ago; Hernia repair age 16.
Also in the chart is an “Anesthesia Record” form (Ex. 1, p. 15), completed by the nurse anesthetist on Mr. Howard’s case, who placed a notation at the bottom left corner:
* DVT p[ost] ACL
Where this information was obtained (e.g., directly from the patient, or by the nurse anesthetist reviewing the Pre Procedure Interview form) cannot be told.
Dr. Brassard saw Mr. Howard again just before surgeiy. He did not review, then or later, the forms that the nurses had completed. Nor did he speak with the nurse anesthetist; or ask either the nurses or the patient about complications following his earlier surgery. Thus, he did not learn of his patient’s post-op DVT in 1998.[3]
With Mr. Howard under general anesthesia, Dr. Brassard performed a repair of the ruptured patellar tendon. His Operative Report observed that “]t]he patient tolerated the procedure well and returned to the recovery room in satisfactoiy condition.” Mr. Howard was discharged later the same day with a prescription for Percocet and instructions to call the office for a followup appointment; “Weight bearing as tolerated; Use crutches; Keep left leg elevated; Ice to left knee.”
Mr. Howard came for his followup appointment on April 15, “[s]ymptomatically . . . doing fairly well.” Dr. Brassard, noting that the “(n]eurovascular status of the leg is intact,”[4] took out his sutures, recommended that he stay in his immobilizer for three and one-half *169 weeks longer, and arranged to see him again on May-12. At this visit Mr. Howard filled out a standard questionnaire for the initial office visit (Ex. 1, p. 36), which revealed that he had a family history of “[b]lood clotting disorders.” Dr. Brassard, who went through the form briefly with Mr. Howard, recalled asking him about this, and that Mr. Howard reported that his brother had suffered a stroke. As before, Dr. Brassard did not ask Mr. Howard whether he himself had any histoiy of clotting disorder.
Two days later, on April 17, Mr. Howard was found dead in his home. The cause of death was a massive pulmonary embolism, a condition that is usually traceable to a DVT and is often fatal. (In layman’s terms, a large clot forms in the leg, then dislodges and travels to the lungs, blocking the pulmonary artery or one of its branches.)
Both sides’ experts testified, and Dr. Brassard agreed in his own testimony, that a patient with a prior medical histoiy of DVT is at significantly increased risk for another DVT and/or a pulmonary embolism following surgery; that the risk increases if the patient is over 40; and that the standard of care in 2004 therefore required that a surgical patient known to have this histoiy be anticoagulated prophylactically following surgeiy.[5] All agreed also that without this histoiy (or the presence of other risk factors not present in Mr. Howard’s case), prophylactic anticoagulation is not indicated. Dr. Brassard testified that had he known of Mr. Howard’s prior DVT, he would have investigated it; that he could have obtained the records of the prior surgeiy and aftercare from his practice group; that Mr. Howard had no contraindications for anticoagulation therapy; and that he therefore would have prescribed it.
Where the experts diverged (somewhat) was on whether the standard of care required Dr. Brassard to do more than he did to ascertain whether Mr. Howard had a histoiy of any relevant medical condition, including coagulopathy. The plaintiffs expert (Dr. Sicherman), observing that at least one and perhaps two nurses who took medical histories from Mr. Howard were able to obtain this information from him, testified that the standard of care required Dr. Bras-sard to inquire whether he had experienced any complications from prior surgeries. Noting that Dr. Brassard learned on April 15 of a family histoiy of clotting disorders, he further testified that the average qualified physician would ask who, when, and the details (which Dr. Brassard may have done, but without eliciting the fact that the patient himself had a histoiy of coagulopathy).
The defense expert, Dr. Barr, gave the following opinions (among others):
Q . . . [D]o you have an opinion to a reasonable medical certainly based on your experience and your teaching as to whether it would be expected for a physician and surgeon in these circumstances to inquire specifically about a histoiy of deep vein thrombosis?
A. I do.
Q. What is your opinion?
A. If I had gone though the system review with the patient and gotten negative answers, I would not specifically ask about a histoiy of deep vein thrombosis in someone like Mr. Howard.
Q. What about — same question with respect to complications of the prior surgeiy?
A. Again, my questioning on that line would be what had been done before, how did it work out, is your right knee functioning reasonably well, are there any problems with it?
Q. Doctor, in your experience would you expect a patient to let you know in these circumstances if he has had a deep vein thrombosis and has been treated over the course of months for that condition?
A. Yes, I would.
(Tr. 4-17-4-18.)
On cross, Dr. Barr said of the question concerning the outcome of and problems with the prior surgery, “That’s a question I think that most surgeons would ask.” Then, he was read Dr. Brassard’s deposition testimony that had not asked such a question of Mr. Howard.[6] When asked on redirect if he thought this omission to be a deviation from the standard of care, however, Dr. Barr said (without elaborating), “I don’t think it is necessarily. No.” (Tr. 4-47.)
The juiy returned a verdict for the defendant, finding no negligence. The verdict came, however, with a request that the following “Juiy Statement” be read:
While we believe Dr. Brassard had some responsibility in Mr. Howard’s death, based on lack of evidence we were unable to determine that Dr. Brassard’s actions deviated from standard of care & treatment.
I shared the contents of the note with counsel, but did not read it in open court. The plaintiffs timely Motion for New Trial, on the ground that the verdict was against the weight of the evidence, followed.
DISCUSSION
I agree with the plaintiff that the jury’s finding of no negligence was manifestly against the weight of the evidence.
The standard that a trial judge is to apply on a motion for a new trial in a civil case is whether the verdict is so markedly against the weight of the evidence as to suggest that the jurors allowed themselves to be misled, were swept away by bias or prejudice, or for a combination of reasons, including misunderstanding of applicable law, failed to come to a reasonable conclusion.
*170 W. Oliver Tripp Co. v. American Hoechst Corp., 34 Mass.App.Ct. 744, 748 (1993). This is an undeniably stringent standard, and is addressed to the sound discretion of the trial judge. When it is met, however, “ [i]t is the right and duty of a judge presiding at the trial of a civil case to set aside the verdict of the jury.” Solimene v. B. Grauel & Co., KG, 399 Mass. 790, 802 (1987), quoting Scannell v. Boston Elevated Ry. Co., 208 Mass. 513, 514 (1911).
That a surgeon, about to operate on a knee and knowing that the patient had undergone surgery on the other knee a few years before, would not ask anything about the outcome and about any complications is surprising, to say the least. Even Dr. Barr, the defense expert, testified that “most surgeons would ask” about these things. On direct and on cross, he seemed reasonably clear that the standard of care required this. Why he was willing, on redirect, to make an exception for this case was not clear, unless it was because he now knew that Dr. Brassard hadn’t done it.
Equally surprising, to a layperson and sometime patient, is that a surgeon would not review the patient’s chart, or at least the written systems review and medical history taken the same day by the surgical nurse. In this case, the very modestly-sized record of Mr. Howard’s emergency room and surgical admissions on March 28-29 — 30 pages in all, of which 20 pages (including six pages of consent forms) had been generated by the time the surgery began — had two very clear alerts concerning his DVT following the earlier surgery. A patient might reasonably wonder why he would be put through a detailed interview by a member of the surgical team if the results are simply to go into the file, unread by the physician who will perform his surgery and assume responsibility for his aftercare.
That said, neither side’s expert witness addressed whether or not the standard of care required the surgeon to review the patient’s chart before surgery and/or before discharge. I assume here that this is not one of the unusual cases in which the jury could properly have resolved this issue without the aid of expert testimony. The jury could, however, consider that since he did not read the chart, Dr. Brassard’s interview of Mr. Howard was the only meaningful opportunity he had to learn of any complications in the prior knee surgery that might shape his course of treatment in a similar, subsequent procedure on the other knee. It was also evident from the chart that Mr. Howard was able and willing to provide such information to those who asked.
One must always beware, especially in a professional negligence case, of Monday-morning quarterbacking. Physicians, like all professionals and other busy people, have much to do and much on their minds. Perhaps this is why the hospital, as standard operating procedure, had a nurse sit with the patient and take a detailed review of systems and medical and surgical history, using a standardized form that prompted her to ask, among many other things, whether the patient had a history of untoward bleeding or clotting. Such medical histoiy checklists— whether administered by a nurse or completed by the patient — have long been a familiar ritual in the new patient’s first encounter with a physician or medical practice. If the physician is not going to avail himself of the information thus obtained, it would seem he ought to obtain it himself, by posing (at the very least) a question to the patient concerning prior surgeries and their outcomes and complications, as both experts testified was standard operating procedure in the profession.[7]
I am satisfied in this case that the verdict in this case was manifestly against the weight of the evidence, and that it is therefore my duty to set it aside and order a new trial.
ORDER
For the foregoing reasons, the plaintiffs Motion for New Trial is ALLOWED. Counsel are to report in the session on April 13, 2010 at 2:00 p.m., or such other date as they may agree and report to the session clerk, for assignment of a new trial date.

 In contrast to the “Pre Procedure Interview” form used by the nurse who saw Dr. Howard (see below), the H&P Short Form has no detailed protocol for inquiring whether the patient has, or has a histoiy of, any particular condition or disorder. To use a courtroom analogy, the H&P Short Form is phrased in terms of non-leading questions, while the ‘Tre Procedure Interview” form facilitates a much more directed interview concerning the patient’s medical history, present complaints, and other areas of potential relevance.

 These are: Heart/Valve, Hypertension, Angina, CVA, Seizures, Sleep Apnea, Arthritis, Kidney/Liver, Anemia, Sickle Cell Trait, Bleeding/Clotting, Digestive/Reflux, Hepatitis, Pacemaker/Defib, Dyspnea, Diabetes, Cancer, Asthma, Immune System, and Thyroid.

 The anesthesiologist, a Dr. Rand, evidently also took a histoiy from Mr. Howard. His form (Ex. 1, p. 16) has a section for “Hematologic/Endocrine/Metabolic,” but the only entry is a “negative” symbol next to “family hx anesth complic”; there is nothing, one way or the other, next to “coagulopathy.” (P. 16.)

 This means, among other things, that there was no sign of a deep vein thrombosis. Dr. Barr testified without contradiction that Mr. Howard must have had a DVT at the time of this visit, but that it was not clinically evident.

 One study, which the plaintiff noticed under G.L.c. 233, §79C and explored at length in questioning of Dr. Brassard (but which was not actually offered or received into evidence), found that 90% of pulmonary emboli follow a DVT; that past treatment for DVT or PB is one of the most important risk factors for venous thromboembolism following surgery, immobility, or serious medical illness; and that patients with such a histoiy are eight times as likely to have a new episode during a period of increased risk. The study appeared in Clinics in Chest medicine, a publication not normally followed by orthopedic surgeons. Dr. Brassard nonetheless agreed with the principle, while observing that the numbers may vary from study to study.

 The deposition testimony was as follows:
Q. Did you ask him any questions about that? Did you ask him if there were any complications from his prior surgery *171 or whether he had any medical problems following his prior surgery?
A. No.
(Read at Tr. 4-43)

 While such a question would probably have avoided the fatal outcome of Mr. Howard’s case, the physician’s familiarity with the results of the “Pre Procedure Interview” would potentially acquaint him with a much wider variety of potential complications unrelated to prior surgeries.